LENA SCHLEUTER et al., Appellants, v. LOUISE REINKING et al., Appellees.

**DESCENT AND DISTRIBUTION:** Distributive Share—Evidence.
1  Evidence held to show that, in the division of an estate, the widow took certain real estate as part of her distributive share.

**WITNESSES:** Competency—Transaction With Deceased. In order
2  to exclude the evidence of an interested party as to a transaction with a deceased person, the objection must be to the incompetency of the *witness*, not to the incompetency of the *evidence.*

*Appeal from Cedar District Court.*—JOHN T. MOFFIT, Judge.

JULY 6, 1920.

SUIT to partition 18 lots resulted in a decree quieting title in defendants. The plaintiffs appeal.—*Affirmed.*

*J. C. France,* for appellants.

*C. J. Lynch,* for appellees.

LADD, J.—August C. Reinking died intestate, October 9, 1891, seized of 18 lots in the town of Clarence and 160 acres of land. A widow, Caroline T. Reinking, and six daughters, who are the plaintiffs, and one son, Henry F. Reinking, survived him. The son married Louise Reinking, June 24, 1896, and died March 25, 1914, leaving him surviving his widow, said Louise Reinking, and four children, all of

1. DESCENT AND DISTRIBUTION: distributive share: evidence.

whom are defendants herein. The farm was sold to the son in 1893, at $52.50 per acre. Two of the daughters were married, and, with their husbands, joined the two other daughters who had attained their majority, in the execution of a deed conveying their interest in the land; and the widow, as guardian of the two minor daughters, conveyed their interest, under proper order of the court. The widow made a separate conveyance, reciting a consideration of $1,885, and conveyed "my one-third interest in and to the N W ¼ section of Section 18," etc. The decedent, August C. Reinking, acquired the 18 lots, about 11 months prior to his death, and, with his family, immediately took possession thereof as his homestead. His widow, with such of the children as were unmarried, continued in the occupancy of the premises until the marriage of all but one of them, Alma, who remained single, and made her home with her mother until the latter died, testate, on July 3, 1911. Her will was duly admitted to probate, and, after bequeathing to two of the daughters $100 each and the household goods, and to the other four $50 each, gave to her "son Henry F. Reinking all the remainder and residue of my estate both real and personal." Alma Reinking continued in possession after her mother's death until some time in 1913, when Henry F. Reinking and his family went into possession of the premises, though Alma occupied two rooms for a while, and left some things there until some time in 1916. This suit was begun October 8th of that year. The plaintiffs alleged that each of them was the absolute owner of an undivided one seventh of the premises, and that the defendants owned one seventh thereof, and prayed that a decree be entered, establishing their respective interests, as alleged, and that the premises be sold and the proceeds be divided accordingly. The defendants pleaded: (1) That the widow took the lots in controversy as a part of her distributive share; (2) that the defendants have been in adverse possession for more than ten years; (3) that the plaintiffs are estopped by their conduct from claiming any interest in the property. Only the first of these need be considered.

Upon the death of the father, the widow took an undivided one-third interest in all the realty, consisting of a farm of 160 acres and the 18 lots in Clarence, which they had occupied as a homestead. Each of the children took one sixth of the remaining two thirds, or two twenty-firsts of these properties. This is on the theory that the widow did not elect to take the homestead in lieu of a distributive share. That she did not do so conclusively appears from her execution of the deed to an undivided one-third interest in the farm, and receipt for the consideration named in the deed. Her continued occupancy of the lots, then, must have been as tenant in common, as contended by appellants, or as owner, as argued by appellees. As no deed to her was executed by any of her six daughters, the burden is on the wife and heirs of her son, Henry F. Reinking, to whom said lots were willed, to show that the widow died seized of the property. On final settlement, in 1893, she received, as her share of the personal estate, $1,757.05, and each of the children received $532.05. In the same year, the farm of 160 acres was sold to the son Henry, at $52.50 per acre, or $8,400. Properly apportioned, $2,800 of this should have gone to the widow and $800 to each of the children. Instead, the widow received but $1,885, and each of the children $930.71: that is, the widow received $915 less than her share, and each of the children, $130.71 more. One explanation of this is that the $915 was taken from the mother's share and distributed to the children, as the total of the latter is but three cents less than the former. It seems hardly probable, however, that, in making such gifts, she would have computed to a cent, or have fixed on the particular amount given. The other explanation, in view of subsequent events, seems the more reasonable. The decedent had paid $1,250 for the lots, within a year prior to his death, and had moved a barn on the premises, at a cost of about $125. If the widow took these lots at cost, or $1,372.50, as part of her distributive share, the several payments would harmonize precisely with values distributed. Add this sum to the price of the land, and divide the

amount by three, and the quotient will be the above amount, plus $1,885, received by the widow; and two twenty-firsts thereof will be $930.71, the amount paid each child. As the personal property was distributed through the administrators as per the final report, there was no other source from which to have paid the extra $130.71 to each of the children. That the lots probably were included in the adjustment is strongly confirmed by the circumstance that no claim to any interest in the premises has been asserted by any of the children, until shortly before the commencement of this action, in October, 1916, or more than 23 years after the transaction. In the meantime, I. P. Ferguson, the attorney who prepared the papers, and before whom these were signed, had passed on, as had the son Henry, and the widow. Mrs. Bergmann, one of the daughters, testified that Ferguson, the widow, and Henry, "figured all of the items that went into the settlement, and made a division, and figured out what was due each of us six girls, all alike. They figured out what mother's legal share was, and paid the share, the same as was going to the other girls, and I signed the receipt." Schleuter, husband of another of the daughters, confirmed this testimony by saying that Ferguson, the widow, and Henry, only, were present when the computation and division were made, though he was there when the value of the land to be conveyed to Henry was agreed to. The witness, over an objection to his competency under Section 4604 of the Code, swore that nothing was then said about selling other property. This must be sustained; for he, as well as his wife, was a party to the suit, and the latter claimed under the widow. Moreover, the answer, if permitted to stand, was not conclusive, as discussion concerning the widow's taking the lots might have occurred at a different time. The only parties to the making of the computation and division subsequently accepted had departed this life before suit was brought, and reliance must necessarily be had on circumstances bearing on whether the widow took the lots as a portion of her distributive share. Of course, no conveyance of the lots was

made. This may have been omitted, owing to the fact that the property must have passed to the children, in the absence of a will, precisely as though a conveyance were executed. On the other hand, if a consideration for the lots passed, she became owner of the lots, as absolutely as though a deed had been executed. Mrs. Bergmann, one of the daughters, was asked:

"Q. Do you remember of signing Exhibit No. 6 [deed] that Mr. Ferguson drew up? A. Yes, sir. Q. At that time, you also signed a receipt for your interest in the real estate of which your father died seized? A. Yes, sir."

She testified further that her husband joined with her in signing the receipt, and was asked whether it was "for your full share and interest in all the real estate of which your father died seized," and answered, "Yes, sir." On cross-examination, however, she explained that she had forgotten what was in the receipt, and was asked, "When you signed the receipt that day, it was for money that Henry was to pay you for the land, wasn't it? A. Yes, sir." She testified further that nothing else than the 160 acres was sold Henry that day, and that that was all that he paid. But no inquiry was made as to whether the lots were included in the computation. Lena Frazee, another daughter, was asked "if, figuring it up at $52.50 per acre, and adding to it thirteen hundred and some odd dollars, as the value of the town property, then taking out ⅓ for your mother and 1/7 of ⅔ figured $930.71 you got paid for your interests, didn't you? A. Well, I suppose."

This excerpt from the testimony indicates that the witnesses were without recollection as to what was included in the settlement, as were the other heirs, and plainly indicates that we must rely on the circumstances of the case, in ascertaining precisely what was included in the adjustment made. Subsequent events were in harmony with the theory that the children were paid for their interest in the lots. In the first place, none of the daughters ever asserted any claim thereto, or interest therein, during the mother's lifetime. Of course, a child may well, owing to affection,

waive the enjoyment of her interest in the home of a parent; but, if so, this is unlikely to continue for 17 or 18 years, without the slightest reference thereto. More improbable still is it that they should continue silent another 5 years after her death, notwithstanding the claims of others, openly asserted, to the premises under her. True, Alma Reinking was then but 17 years of age, and Emma Frazee, née Reinking, only 16 years old, when the widow, as guardian, conveyed the land; but they acquiesced for more than 20 years after having attained their majority, and settled with their guardian. The circumstances happening in the meantime emphasize the significance of this long delay. The widow of Henry F. Reinking testified that, in 1898, she heard a conversation between her husband and his mother, in which she took no part, and in which it was said that her daughter Lena wanted her to allow her husband to oversee the building of the house; whereupon Henry said: "If you want to do that, all right: I haven't much time, and I'm short of money. He can do it if you want," and that she replied that she did not want to do that; and that, if he "would build there and do as you always have done and look after things, the property is yours, after I get through with it." The evidence conclusively shows that Henry hauled the material and took entire charge of constructing the house, which cost $1,600 or $1,800. The old part was pushed back, and an eight-room house constructed in front.

The widow of Henry was asked if he paid for the house. This evidence was objected to as incompetent. The objection was rightly overruled. The witness may have been incompetent, under Section 4604 of the Code, but that objection was not interposed. As a note of $1,885, the amount named in the deed from the widow to Henry, bearing date August 15, 1893, executed by him to her, was found in her papers, upon her death in 1911, probably this was given in consideration of the deed. If so, it had not been made use of in building the house. What may have been done with

2. WITNESSES: competency: transaction with deceased.

her share of the proceeds of the personal property does not appear. Conrad testified that Henry purchased the lumber for the house from him, and paid him for it, in all $633. The testimony of the daughters as to what their mother said about paying for the house cannot be considered, because of their incompetency as witnesses, under Section 4604 of the Code. Regardless of who paid, Henry or his mother, an improvement costing about $1,800 was put on the property, without contribution on the part of the daughters now claiming to have been tenants in common, with their knowledge, and without objection. Moreover, the widow of Henry was asked: "Did she [Henry's mother] claim it as having only a life use or absolutely?" and answered: "She claimed to own it." An objection that the evidence was incompetent under Section 4604 of the Code should be overruled. That section does not relate to the competency of evidence. It prohibits witnesses from testifying to defined transactions or communications, thereby rendering them incompetent to speak with reference thereto. The objection was insufficient, and her answer is to be considered. Again, the widow willed her personal effects to her two youngest daughters, with $50 each, and $50 each to two others, and to the remaining two, $100 each. Henry was named as executor, and as such caused the will to be admitted to probate, and settled the estate by paying all legacies, together with a $1,000 claim for the care of decedent, filed by Alma Reinking. This left $251.35, which was retained by Henry, under the residuary clause leaving all else to him. No objection thereto was interposed, nor to his occupancy of the premises from March 1, 1913, until his death, March 25th of the following year, under claim of ownership; nor to the occupancy of his widow and four children during the four years following, under a like claim, nor to sale of two of the lots by his widow, and as guardian of the estate of her children; nor to the erection of a house on one of the lots so sold to Rev. Hanson, at a cost of $3,600, although all were fully aware of the purchase of the lot, and of the building. Alma Reinking told Mrs.

Ralston that "this town property was to go to Henry at the time of his mother's death." Mrs. Bergmann told Henry's widow that the daughters knew, and had always known, that Henry was to have the house, because he built it. Mrs. Conrad admitted that it was understood that Henry was to have the town property. Everything done subsequent to the settlement in 1893 was inconsistent with the retention of any interest in the 18 lots by the daughters, and entirely consistent with the ownership by their mother. She paid each of the children the fair value of a 2/21 interest in the property, and there is no escape from the conclusion that this payment was for such interest, or was a gift. Her claim that she owned the lots tended strongly to confirm the theory of having purchased them. Her agreement with Henry that he was to have the property if he would construct the house was another assertion of ownership which the daughters must have known of, for they admitted an understanding that the premises were to go to Henry after their mother's death. The daughters acted in harmony with the conclusion that the mother acquired the children's interest in the lots at the settlement, during 23 years thereafter. That conclusion is consistent with all the circumstances of the case, and the latter are inconsistent with any other conclusion. We are not inclined to interfere with the finding of the district court that the widow of the intestate acquired by purchase of the heirs their interest in the lots, and that the petition was rightly dismissed.—*Affirmed.*

WEAVER, C. J., GAYNOR and STEVENS, JJ., concur.