JAMES GORDON LUNEY et al., Appellants, v. JAMES ROLLINS et al., Appellees.

**LIMITATION OF ACTIONS:** Cotenant—Implied Ouster. A cotenant of real estate, who, without making any claim to the property, resides for 30 years in the immediate vicinity thereof and is intimately familiar therewith, and knows that the cotenant in possession is improving the property under a claim of absolute ownership, must be held to have been ousted from the property and to have lost all interest therein.

*Appeal from Crawford District Court.*—E. G. ALBERT, Judge.

JUNE 25, 1921.

ACTION to quiet title. Decree in favor of defendants James and Emma Coleman Rollins. Plaintiffs appeal.—*Reversed.*

*Conner & Powers,* for appellants.

*Sims & Kuehnle,* for appellees.

STEVENS, J.—This is an action to quiet title to Lot 1, Block 139, in the city of Denison. Martha Smyth died intestate, May 30, 1888, without issue, survived by her husband, Samuel Smyth, and seized in fee of the above-described real estate. She was also survived by two brothers, John and James Rollins, so that title to the property passed, one half to Samuel Smyth, her husband, and one fourth to each of her brothers. The defendant Emma Coleman Rollins is the wife of James Rollins. Plaintiffs are distant relatives of Samuel Smyth's, and base their claim of ownership upon a warranty deed from him, executed March 22, 1907, for an expressed consideration of $1.00 and love and affection, and upon adverse possession. In 1889, Samuel Smyth and his brother James erected a small story and a half residence on the above-described lot, and moved from the country, where they previously resided, into said house, and continued to reside there until the death of James, which occurred a few years before the death of Samuel. Samuel died in 1913. After the death of James, Samuel, although retaining possession of the house, ate his meals and slept at the home of his nephew Samuel Luney, and later at the home of his nephew William Luney. The warranty deed conveying the property jointly to plaintiffs was, immediately upon its execution, delivered to Samuel Luney, who was then their legal guardian, they being minors. Samuel Luney placed the deed with papers belonging to him, in a local bank, where it remained until after the death of Samuel Smyth, when, on October 6, 1913, it was filed for record and recorded in the office of the county recorder. None of the plaintiffs went into possession of the property until after Samuel's death, although they knew that a deed conveying the property to them had been executed. The record, although brief, shows that Samuel Smyth at all times after his wife's death exercised exclusive control over the property, paid the taxes, and claimed to be the absolute owner thereof. Appellee lived in the country near Denison, at the time of his sister's death, and, in the ordinary course of travel to and from Denison, passed by the property in question. He must, therefore, have known that a residence was being built upon the lot. · He has at all times since resided in Denison or vicinity. James Rollins, so far as the record discloses, never asserted any claim or interest to or in the property

until a short time before this action was commenced, when the plaintiffs' stepfather requested him to execute a quitclaim deed to them for the purpose of quieting the title. This he declined to do, saying that he first wanted to ascertain whether he had an interest therein. James Rollins appears to have maintained friendly relations with Samuel Smyth, as he admits having occasionally visited him at his home. So far as the record shows, however, the title or ownership of the property was never the subject of conversation between them. Apparently, both assumed that Samuel was the owner thereof. That Samuel claimed in good faith to own the property is manifested by the erection of the residence thereon, a few months after the death of his wife, the consistent and continuous assertion of ownership, and the occupancy and control thereof for more than 30 years. During all of this time, James, although he must have known all of the above facts, never disputed Samuel's claim, or asserted or sought to claim any interest in or right to the property or its possession.

The law that the entry and possession of one tenant in common is presumed to be for the benefit of all, and that such possession is to be regarded as the possession of all, until rendered adverse by some unequivocal act or series of acts or declaration of the tenant in possession indicating or proclaiming his intention to claim the entire estate, and brought to the actual notice of his cotenants, is too familiar to call for discussion. It is equally well settled that a tenant in possession may oust his cotenant and start the statute of limitations to running, and acquire title to the whole by adverse possession. Actual notice of the hostile claim of the tenant in possession must, however, be brought to the attention of his cotenant before the statute will run. The rule announced in *Burns v. Byrne,* 45 Iowa 285, has been consistently followed. It is as follows:

"The seizin and possession of one tenant in common are the seizin and possession of the other. One can never be disseized by another without an *actual ouster.* By *actual ouster* is not meant a physical eviction, but a possession attended with such circumstances as to evince a claim of exclusive right and title, and a denial of the right of the other tenants to participate in the profits. An actual ouster and consequent adverse possession

might be inferred from sole possession and an exclusive reception and enjoyment of the rents and profits, with the knowledge and implied acquiescence of the other tenant in common, for the period of ten years.''

Mere occupancy for 10 years by one tenant in common is manifestly not, in itself, sufficient to justify a claim of ownership by adverse possession, although courts in some other jurisdictions have held that exclusive occupancy for a long time may justify an inference of ouster. *Flock v. Wyatt,* 49 Iowa 466. Actual notice of ouster may be proven by either direct or circumstantial evidence. *Casey v. Casey,* 107 Iowa 192. It will serve no useful purpose for the court to review our long line of decisions upon this question, but see the following: *Moore v. Antill,* 53 Iowa 612; *Laraway v. Larue,* 63 Iowa 407; *Knowles v. Brown,* 69 Iowa 11; *Killmer v. Wuchner,* 74 Iowa 359; *Bader v. Dyer,* 106 Iowa 715; *Casey v. Casey,* supra; *Blankenhorn v. Lenox,* 123 Iowa 67; *Curtis v. Barber,* 131 Iowa 400; *Frye v. Gullion,* 143 Iowa 719; *Goulding v. Shonquist,* 159 Iowa 647; *Sagen v. Gudmanson,* 164 Iowa 440; *Erickson v. Johnson,* 172 Iowa 12; *Schleuter v. Reinking,* 189 Iowa 452; *Ratigan v. Ratigan,* 181 Iowa 860.

As already stated, Samuel Smyth and his brother erected a dwelling house upon the lot in controversy, and moved into it within a year after the death of Martha Smyth, in 1888. They continued to occupy it until the death of James, more than 25 years later. During all of this time, Samuel claimed to own it, paid the taxes thereon, and in 1907 executed a warranty deed, conveying the entire property to plaintiffs. So far as shown by the evidence, he .kept the property in repair, and apparently never dreamed that James Rollins claimed to have an interest therein. All of these facts must have been known to the defendants; yet James Rollins does not claim that he ever denied that Samuel Smyth owned the property, nor did he ask for the partition thereof or claim compensation for the use of his interest, or otherwise assert claim to the property. It is, however, claimed by James that no administration was ever had of the estate of Martha Smyth, and that she left considerable money which was used by her husband in the erection of the house. The record, however, sustains this contention only to the extent of

showing that Martha may have left a very small amount of money. There is no evidence that any part of it was used to defray the cost of the building. It is inconceivable that, if James Rollins claimed to have an interest in the property in controversy, he would not in some way have asserted it, either when he learned that Samuel Smyth had taken possession thereof and was erecting a dwelling house thereon, or at some later date while Samuel lived. Surely, he would not have remained silent for so many years without in some way manifesting his claim. He could not reasonably have presumed that Samuel erected the building, the cost of which, doubtless, was largely in excess of the value of the lot, for the benefit of his cotenants, as well as himself. While mere occupancy of the premises, even for a longer period than 10 years, is not alone sufficient to obtain title against a cotenant by adverse possession, yet, when this fact, coupled with all of the other facts and circumstances shown in the case at bar, is considered, the inference of ouster, with notice to the cotenants, can be little short of conclusive. The record does not show that James Rollins knew of the warranty deed executed by Samuel Smyth to plaintiffs until after it was recorded, nor did plaintiffs go into possession under it until 1913, after the death of Samuel Smyth. It is our conclusion, upon the whole record, that the evidence fully sustains plaintiff's claim to the property, and the decree of the court below is, therefore,—*Reversed.*

EVANS, C. J., ARTHUR and FAVILLE, JJ., concur.